**In the United States District Court
for the District of Kansas**

---

Case No. 2:19-cv-02445-TC

---

NAOMI DORRIS,

*Plaintiff*

v.

IT'S GREEK TO ME, INC., d/b/a GTM Sportswear,

*Defendant*

---

**MEMORANDUM AND ORDER**

Naomi Dorris filed this action against her former employer, It's Greek to Me (d/b/a GTM Sportswear), alleging GTM terminated her employment in violation of state and federal law. Doc. 60. GTM moved for summary judgment on all claims. Doc. 61. For the following reasons, GTM's Motion for Summary Judgment is granted.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga, Okl.*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

This is an employment discrimination case. In short, Dorris contends that GTM's termination of her employment violated state and federal rights.

GTM is Kansas corporation that does business in Manhattan, Kansas. Doc. 60 at § 2(a)(ii). GTM portrays itself as a national provider of custom school and sports apparel who employs "Customer Experience Representatives" to interact with customers and potential customers about their concerns and orders over the phone. Doc. 65 at 1–2.[1] Dorris, who is African American, began working as a Customer Experience Representative for Defendant on August 27, 2018. Doc. 60 at §§ 2(a)(vi), (vii), and (viii).

---

[1] Plaintiff's Response provides 228 additional numbered statements of fact beginning with the number 1. Doc. 65 at 41–77. To avoid confusion, this Memorandum and Order cites to not only the paragraph number but also the page number on which the particular fact begins.

While employed, Dorris had three supervisors: Patty Dewitt (Customer Experience Supervisor), Abigail Wahl (Customer Experience Team Lead), and Amber Siscoe (Customer Experience Supervisor). Doc. 65 at 42–43, ¶¶ 12, 14, 16. All three supervisors reported to Jennifer Glodowski, the head of the Customer Experience and Sales Department. *Id.* at 43, ¶ 24. Jessica Thomas was the Human Resources ("HR") Business Partner, and Casey Butler was Vice President of HR. *Id.* at 43, ¶¶ 19, 21.

GTM terminated Dorris on February 7, 2019, less than six months after she was hired. Doc. 60 at § 2(a)(xxi). Dorris asserts that her termination was illegal.

**1.** Dorris's brief tenure with GTM was marked by several difficulties, which give rise to the present case.

**a.** GTM alleges, and Dorris acknowledges, that Dorris repeatedly failed to meet GTM's expectations vis-à-vis showing up for work and interacting with customers. First, on January 16, 2019, Dorris did not appear for her scheduled 7 a.m. shift and had failed to notify her supervisor she would be out. Doc. 60 at § 2(a)(xix); Doc. 65 at 55, ¶¶ 88–91. Dorris's supervisors, Wahl and Siscoe, delivered a Written Warning for the incident, which was approved by Glodowski, the department head. Doc. 60 at § 2(a)(x); Doc. 65 at 15, ¶ 44. The warning stated that "[Dorris] needs to notify her supervisor when she will be out of the office." Doc. 61-5 at 109.

Second, Glodowski received notice that a customer complained about a call with Dorris on January 30, 2019. Doc. 65 at 17, ¶¶ 50–51. Glodowski reviewed a recording of the call with Butler, VP of HR, and determined that Dorris's behavior warranted a Final Warning for failing to follow GTM's Customer Service Expectations. *Id.* at 17, ¶¶ 51–52; Doc. 61-6 at ¶ 13. Glodowski, without objection from Butler, issued Dorris that Final Warning on February 1, 2019. Doc. 60 at § 2(a)(xi); Doc. 65 at 17, ¶ 52; Doc. 61-6 at ¶ 14. The Warning provided examples of Dorris's deviation from the policy: "Placing customers on hold, gathering payment information, first call resolution, professionalism on the phones, and lack of basic customer service skills." Doc. 65 at 59, ¶ 115; Doc. 65-26.

Finally, on February 7, 2019, Dorris arrived to work at 7:41 a.m., 41 minutes after her shift was scheduled to start. Doc. 60 at § 2(a)(xix). She did not text or call her supervisors to let them know she would

3

arrive late. *Id.* at § 2(a)(xx). Wahl notified Glodowski that Dorris had come in late without calling or texting. Doc. 65 at 27, ¶ 75. Glodowski reviewed the information Wahl provided and issued a Separation Notice for "Failure to Follow Procedures" and commented that "[Dorris] was 41 minutes late for her shift . . . [and] did not notify her manager or use the company call in line to notify [Defendant] she was going to be late." *Id.*; Doc. 65-36. Thomas, the HR representative, and Butler, Thomas's supervisor, reviewed the notice, and Butler approved it. Doc. 65 at 27–28, ¶¶ 75–76. Dorris was terminated later that day. Doc. 60 at § 2(a)(xxi).

**b.** While Dorris does not dispute these facts, she claims that her record was not all bad. Dorris also notes that she did not enjoy a supportive relationship with her immediate supervisors, Dewitt, Wahl, and Siscoe.

Regarding her performance, Dorris notes that she was recognized for a commendation within the company. In January 2019, Dorris received a "ShoutOut" award (which "thanks employees for going above and beyond the call of duty") for helping a customer place an order. Doc. 65 at 41, ¶ 6 & 79 n.3; Doc. 65-2 (awarding her movie tickets). She also regularly appeared in the top Customer Experience Representatives' "Call & Chat Stats," which her supervisors sent daily to rank Dorris and her peers based on customer interaction. Doc. 65 at 41, ¶¶ 7–8; Doc. 65-3.

And, with regard to her immediate supervisors, she paints a picture of internal office dynamics that were, at best, churlish and unprofessional. Moreover, Dorris argues their conduct exhibited racially motivated, differential treatment. Doc. 65 at 27, ¶ 75; 30, ¶ 86; 34, ¶ 98; 83–87.

Dorris generally points to three categories of evidence to support her belief. The first category consists of comments Dorris describes as a request that she make her voice "more peppy, chipper, upbeat"—*i.e.*, more like "young, white women" such as Wahl and Siscoe. Doc. 65 at 19–20, ¶ 57, 83; Doc. 65-1 at ¶¶ 13, 61, 83; Doc. 65-27. That message was relayed in the February 1, 2019, meeting where Wahl, Siscoe, and Dewitt delivered the Final Warning to Dorris. Doc. 65 at 19, ¶ 55. During that meeting, Wahl and Siscoe replayed the customer call and, according to them, "explained to [Dorris] that the way she had presented herself to the customer was not appropriate or professional." *Id.* at 19, ¶ 56. Dorris believed her supervisors thought she was

"monotone" and unfriendly on customer calls. *Id.* at 31–32, ¶¶ 88, 91. Dorris told Wahl and Siscoe they were picking on her and felt that she was graded poorly because she did not sound like a young, white female. *Id.* at 19–20, ¶ 57; *see also* Doc. 65-26. She believes neither considered that she is black and has a different "tone and tenor of voice" than what they wanted her to use. Doc. 65 at 29, ¶ 83; 61, ¶ 124.

Wahl and Siscoe wrote up their recollection of the meeting with Dorris and sent it to Thomas, along with a copy of the Final Warning. Doc. 65 at 21, ¶ 59; 25, ¶ 66; *see* Doc. 65-27. In response, Thomas asked Wahl, Siscoe, and Dewitt for "a summary of [Dorris's] response" and "exactly what [Dorris] said in regards to how she felt i.e.) [sic] we are discriminating against her because of the way she talks." Doc. 65 at 21, ¶ 60. According to Wahl and Siscoe, Dorris stated "that [they] were critiquing her for the way that she talks, saying that she does not talk like 'us', she talks how she wants to talk and she has her own personality" and then continued to "mock parts of the call in '[their] voice.'" *Id.* at 19–20, ¶ 57; 22, ¶ 61; *see* Doc. 65-27. Thomas asked, "So to be clear Naomi didn't mention anything really about discriminating against her? It was more picking on her and she talks differently than us?" Doc. 65 at 21, ¶ 60; 63, ¶ 137; *see* Doc. 65-29. Wahl replied, "Correct, she did not specifically state it, or use the term 'discrimination,'" and added that Dorris had said "she is not like [them] and does not speak like [them]" and that "[they] were wanting her to speak like [them] and she isn't going to do that because she is not like [them]." Doc. 65 at 63, ¶ 138; Doc. 65-29. Thomas did not conduct any further investigation or ask Dorris about the February 1 meeting. Doc. 65 at 65, ¶ 139.

Dorris believed Wahl, Siscoe, and Dewitt (and later that Thomas and Butler) were biased against her because of her race, Doc. 65 at 29–30, ¶ 84, and treated her differently because of it, *see, e.g., id.* at 29, ¶ 82 (admitting that Dorris believed another African American co-worker was treated more favorably after arriving late because she talked "like a white girl"). *See id.* at 83–87. Among other things, she points to Wahl and Siscoe's use of "us" and "our voice" in their emails to Thomas and Thomas's failure to follow up with Dorris about whether she was complaining of discrimination during that meeting. *Id.* at 85. She does not provide any evidence or basis to believe Butler or Glodowski were motivated by race.

The second category of conduct is a series of text messages between Wahl and Siscoe where they monitored and mocked Dorris's

5

termination process. Doc. 65 at 67–69, ¶¶ 162–179; *see* Doc. 65-38. Dorris believes these messages evince that Wahl and Siscoe "were excited to see her employment terminated." Doc. 65 at 34, ¶ 98; 84 n.9; 88.

The third category of conduct is the way GTM applied its Progressive Discipline Policy. In general, Dorris contends that GTM applied that policy to her in one way and to similarly situated white employees in a different, more favorable way. Doc. 65 at 79–83.

The policy includes four steps: coaching, written warnings, final warnings, and termination of employment. Doc. 65 at 3, ¶ 7; Doc. 61-5 at 25. GTM can start this discipline process at whichever step it believes appropriate based on employee conduct. Doc. 65 at 4, ¶ 8. Written Warnings are administered on a form, which has boxes designating separate behavioral concerns, including "Tardiness/Absenteeism" and "Failure to Follow Procedures." *Id.* at 51, ¶ 66; *see e.g.*, Doc. 61-5 at 109. GTM has several other policies dictating behavioral expectations, including its Attendance Policy that requires all employees to "notify GTM by calling in on the call-in line as far in advance as possible, if he/she expects to be late or absent." Doc. 61-5 at 22. GTM is an "at-will" employer. *Id.* at 12.

Dorris spends much time criticizing GTM for the way it administered its Progressive Discipline Policy. She does not contest the underlying facts giving rise to her discipline, but instead claims she was treated less favorably under this policy than she believes she should have been. For instance, she claims GTM improperly categorized the January 3, 2019, meeting with Wahl as a "coaching" when it should not have been categorized as that. Doc. 65 at 10–11; 13, ¶ 39. In addition, she received a Written Warning for failing to notify her supervisor she would be out on January 16, 2019; a Final Warning for her performance on the January 30, 2019, customer call; and termination after failing to notify her supervisors she would be late on February 7, 2019. *See* Doc. 60 at §§ 2(a)(x)–(xi), (xxi). Dorris believed that her African American colleague was not disciplined as harshly despite also arriving late on February 7, 2019, without providing advanced notice because she "talks more like Wahl and Siscoe." Doc. 65 at 29, ¶¶ 81–82. And she contends that two white co-workers, A.S. and M.M., were also disciplined for various infractions in ways that Dorris argues was less severe than what she experienced. Doc. 68-1 at ¶¶ 181–195.

GTM responds with uncontroverted evidence that this third category of evidence does not cut quite a cleanly as Plaintiff argues. Doc. 68 at 24–26. In particular, GTM notes that the comparators Dorris cites are not similarly situated because neither white employee failed to report to work for several hours without advanced notice. *Id.* at 24; Doc. 65-18 (attendance spreadsheet). Both received warnings. Doc. 68 at 24; Doc. 65-41 (A.S. Final Warning); Doc. 65-42 (M.M. Written Warning). And GTM points to evidence that it disciplined other white employees for the same conduct which Dorris was in an equal magnitude. Doc. 65 at 33, ¶¶ 92 (terminated white employees for failure to follow procedures), 93 (disciplining for being a no-call, no-show), 94 (disciplining without prior coaching being noted on the form); Doc. 68 at 25 (listing other white employee discipline).

**2.** Dorris's claims also implicate her medical concerns while working at GTM. These issues give rise to her ADA and workers' compensation claims.

After starting at GTM, Dorris selected a standing desk (rather than a regular, seated desk) for her workstation. Doc. 65 at 7, ¶ 19. Although she wanted a standing desk, she asked Wahl, her then-supervisor, for a higher chair to match her standing desk, but Wahl stated, "We don't have that." *Id.* at 7, ¶ 20. Dorris eventually purchased her own tall chair to use at her standing desk but worked at her desk without a tall chair for ten days in September 2018. *Id.* at 7–8, ¶¶ 19, 22–23; Doc. 61-5 at 85–89. Dorris testified that when she showed Wahl how her lower chair meant she had to type at an awkward angle, Wahl agreed that typing at an awkward angle could cause wrist pain. *Id.* at 105.

Dorris visited GTM's on-site medical clinic, K+Stat Urgent Care, in early January 2019 for wrist pain and told the doctor there she had been experiencing it for two weeks. Doc. 65 at 38, ¶ 108. At her subsequent visit a few weeks later, the doctor recommended she make a workers' compensation claim. *Id.* at 39, ¶ 109.

On February 4, 2019, Dorris reported to Thomas that she believed the pain in her wrist was work-related due to having a "high desk" and "low chair." Doc. 60 at § 2(a)(xii); Doc. 65 at 23, ¶ 63; Doc. 68-1 at ¶ 141. Thomas sent her back to K+Stat, where she was diagnosed with "right wrist tendonitis with early carpal tunnel syndrome" and cleared for work "so long as she wore a wrist splint, had an ergonomic keyboard, had her desk at the correct height, and stretched her wrists hourly." Doc. 68-1 at ¶ 144; *see* Doc. 65-33. Consistent with that

7

diagnosis, Dorris requested an ergonomic wrist rest that GTM ordered on February 5, 2019. Doc. 65 at ¶ 64; Doc. 65-34 at 1–2. Dorris believes that Thomas was "perhaps[] annoyed" about the claim, Doc. 65 at 106 n.22, and notes that GTM (and its insurer) expressed doubt as to the claim's validity, *id.* at 107.

**3.** Dorris asserts four claims in this litigation. In three, she alleges that she was terminated because of her race, *see* 42 U.S.C. § 2000e, *et seq.*, in retaliation for engaging in protected opposition, *see id.* § 2000e, and in retaliation for seeking workers' compensation benefits, *see Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014) (citing *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002)). Doc. 60 at § 3(a). In the other claim, she alleges that GTM failed to accommodate a disability. *See* 42 U.S.C. § 12101, *et seq.*; Doc. 60 at § 3.

GTM moved for summary judgment on all claims. Doc. 61. The parties have submitted a large volume of material in support of and in opposition to that Motion, including a sur-reply and a response to that sur-reply. Docs. 62, 68, 69, 69-1, 70. In addition, the parties argued their cases at a summary judgment hearing.

## II

Dorris's claims can be divided into two general categories for analysis purposes. In one category, she contends that she was terminated based on race, in retaliation for engaging in protected conduct, and for filing a workers' compensation claim. All three require a similar burden-shifting framework. In the other category, she contends that GTM failed to accommodate her disability. Her claims fail because she failed to identify evidence creating a genuine dispute of material fact. As a result, GTM is entitled to judgment as a matter of law.

### A

Dorris claims that she was fired due to her race, in retaliation for commenting about potential racial discrimination, and for filing a workers' compensation claim about her work-related wrist tendonitis/pre-carpal tunnel syndrome. Doc. 60 at § 3. All three fail for essentially the same reason: there is no evidence undermining GTM's facially legitimate, non-discriminatory reason for her termination.

The Tenth Circuit applies the same basic test for all three claims. Where, as here, a plaintiff relies on circumstantial (rather than direct)

evidence to establish that his or her termination was based on race, in retaliation for engaging in protected conduct, or was motivated by pursuit of worker's compensation relief, the Tenth Circuit directs the application of the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981). *See Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015); *see also Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (race discrimination); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) (retaliation); *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014) (workers' compensation).

The *McDonnell Douglas* framework contains three steps. A plaintiff must first show a *prima facie* case of discrimination, *i.e.* demonstrate that the circumstances surrounding the adverse employment action give rise to an inference of unlawful discrimination. *Barlow*, 703 F.3d at 505. The essential elements to satisfy that step vary for the three types of claims. For example, to show a *prima facie* case for racial discrimination under Title VII, Dorris must demonstrate that she was a member of a protected class, qualified for and satisfactorily performing her job, and terminated under circumstances giving rise to an inference of discrimination. *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).[2] The elements for the other claims are similar. *Thomas*, 803 F.3d at 514 (retaliation); *Macon*, 743 F.3d at 713 (workers' compensation).

The subsequent two steps are the same for all three types of claims. If the plaintiff meets her initial burden, the defendant must then provide a legitimate, non-discriminatory reason for its action. *See Salguero*, 366 F.3d at 1175. Finally, if the defendant meets that "exceedingly light" threshold, *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011), the burden shifts back to the plaintiff to identify evidence suggesting that the defendant's proffered reasons are pretextual or unworthy of belief. *Id.* (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).

---

[2] Plaintiff argues that she need not establish that she was satisfactorily performing her job and declines to do so on this record for obvious reasons. Doc. 65 at 79 n.3. But that is one of the most powerful ways to rebut the non-discriminatory reason for termination. *See, e.g., Barlow v. C.R. England, Inc.*, 816 F. Supp. 2d 1093, 1102 (D. Colo. 2011), *aff'd in part, rev'd in part*, 703 F.3d 497 (10th Cir. 2012) (finding plaintiff's failure to report missing property—a required duty for his job as a security guard— was a legitimate and nondiscriminatory reason for termination).

A plaintiff can establish pretext through showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). Such evidence must demonstrate that "a reasonable factfinder could rationally find [the reasons offered] unworthy of credence" and allow an inference that the employer "did not act for the asserted non-discriminatory reasons." *Id.* Said another way, the plaintiff must provide sufficient evidence to convince a jury that defendant was motivated by a factor other than their proffered reason. *See Salguero*, 366 F.3d at 1177–78.

GTM maintains that Dorris has not satisfied her burden under the first step for any of the three claims. Doc. 62 at 22–24 (discrimination), 37–41 (retaliation), and 48–49 (workers' compensation). But that burden is quite light and it can be assumed, for the sake of argument, that Dorris's evidence is sufficient to carry her *prima facie* burden for all claims.

Likewise, GTM has satisfied its burden of articulating a legitimate, non-discriminatory reason. Specifically, it asserts that it terminated Dorris because, having been admonished for repeated late arrivals without prior notice and receiving a "Final Warning" for the way that she conducted a customer call, she once again failed to follow company procedure when she arrived late for her shift on February 7, 2019. Doc. 62 at 35; Doc. 65 at 90. That is sufficient. *See, e.g., Barlow*, 816 F. Supp. 2d at 1102; *Carter*, 662 F.3d at 1149 (holding that an altercation and use of an expletive on the phone provided "legitimate and non-discriminatory" reasons for terminating the employee).

The viability of Dorris's claim hinges on her ability to show that GTM's non-discriminatory proffered reason is pretextual. *See, e.g., Morgan*, 108 F.3d at 1323. Her burden to show pretext is relatively high here because Dorris readily admits that she engaged in the conduct giving rise to GTM's termination decision. She concedes that she (i) failed to show up for work without prior notice on January 16, 2019, which led to her receipt of a written warning; (ii) failed to perform as GTM expected during a January 30, 2019, customer phone call, which led Glodowski to issue her a Final Warning; and (iii) once again failed to arrive at work on time (or to notify her supervisors to as much) on February 7, 2019, despite a general warning text sent to all CERs the night before to do so. *See* Docs. 60 at §§ 2(a)(x)–(xi), (xviii)–(xx); 65 at 81. Thus, the evidence is far from suggesting that GTM's decision was "unworthy of belief"; it confirms GTM acted as it described and had

an appropriate factual basis for doing so. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (finding no error where a district court granted summary judgment for an employer that made the firing decision based on the "undisputed evidence" showing the employee had pushed and verbally abused a co-worker without any evidence before the decision-maker to suggest otherwise).

In light of these admitted failures, Dorris's contrary arguments are insufficient to create a genuine dispute of material fact or salvage her claims.

### 1.

For her Title VII racial discrimination claim, Dorris contends that she should be able to submit her claim to a jury because she has inferential proof confirming her belief that Wahl, Siscoe, and Dewitt treated her differently because of her race. Specifically, she claims that they unfairly and unevenly administered GTM's internal progressive discipline against her when compared to her white co-workers resulting in a rushed termination against the company's internal policies and procedures. Doc. 65 at 91. There are at least two fatal flaws with that line of argument.

*First*, her argument fails because Glodowski, not Wahl, Siscoe, or Dewitt, made the decision to terminate Dorris. Doc. 65 at 27, ¶ 75. Dorris has offered no evidence that Glodowski's termination decision was motivated by or even implicated Dorris's race. *See generally* Docs. 65 & 69-1. Instead, Dorris admits that she engaged in the conduct that Glodowski relied on when terminating her. *See* Doc. 60 at §§ 2(a)(x)–(xi), (xviii)–(xx); Doc. 65 at 8, ¶ 24. That evidence precludes her claim that GTM's termination was mere pretext for racial discrimination. *Salguero*, 366 F.3d at 1177–78 (affirming summary judgment for the city because there was no pretext absent some nexus between "a racial comment" made by the deputy chief of police, who was not responsible for decision-making, and the plaintiff's firing).

Even when the ultimate decision-maker is free from racial animus, it is still possible for a plaintiff to establish pretext where the ultimate decision-maker is a mere "cat's paw" or rubber stamp for the subordinate's discriminatory animus. *See, e.g., Thomas*, 803 F.3d at 514. That theory gives rise to liability if a plaintiff is able to present "evidence that a biased subordinate who lacked decision-making power used the

formal decision-maker as a dupe in a deliberate scheme to bring about an adverse employment action." *Id.*

Dorris, for good reason, does not allege that Glodowski blindly relied on the allegedly biased views of Wahl, Siscoe, or Dewitt. As noted previously, Glodowski was personally familiar with Dorris's pattern of behavior: she personally listened to the January 30 customer call following a complaint—originated from a customer, not from Wahl, Siscoe, or Dewitt—and then in consultation with HR—and again, not with Wahl, Siscoe, or Dewitt—issued Dorris's Final Warning. That independent investigation breaks any causal chain that could exist between the allegedly racial biases of anyone else and the ultimate termination decision. *Cf. Singh v. Cordle*, 936 F.3d 1022, 1039–39 (10th Cir. 2019) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011), in support of the rule of non-liability where someone higher up in the decision-making process independently investigates the grounds for dismissal).

*Second*, Dorris's assertion that GTM inequitably applied its internal disciplinary policy fails for several reasons. For one thing, Dorris points to no evidence suggesting that Glodowski knew or had reason to suspect Wahl, Siscoe, or Dewitt were inconsistently applying GTM's policy. *Cf Plotke v. White*, 405 F.3d 1092, 1105 (10th Cir. 2005) (finding pretext where there was evidence the decision-maker had personal knowledge of inconsistent information related to the firing decision). The absence of such knowledge, especially when coupled with the results of the independent investigation Glodowski undertook, precludes Dorris's claim under this theory. *See, e.g., Macon*, 743 F.3d at 714 n.2 After all, "Title VII only prohibits discrimination on the basis of certain, invidious factors. Employers are free to terminate at-will employees for any other reason—however unfair, unwise, or even erroneous—so long as it is not unlawful." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1153 (10th Cir. 2008).

For another, relying on differential application of GTM's internal disciplinary policy is a high bar that Dorris's evidence cannot meet. A plaintiff may show pretext by pointing to evidence indicating that he or she was treated differently from similarly situated, nonprotected employees who violated work rules of comparable seriousness. *See Kendrick*, 220 F.3d at 1232; *see also Bennett*, 792 F.3d at 1267 (finding no inference of animus with one policy because the record showed that it applied uniformly to a number of employees and not just to female employees). To do so, the plaintiff must establish that she deals with

the same supervisor and is subject to the same standards governing performance evaluation and discipline as her comparators. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). Courts should also "compare the relevant employment circumstances, such as work history and company policies" between the employees to determine whether they are similarly situated. *Id.*

Title VII does not make unlawful any unexplained difference in treatment or inconsistent, irrational, or even foolish employment practices. *Bennett*, 792 F.3d at 1268. It recognizes an employer's business judgment; employers (and their supervisors) must deal with a multitude of employment decisions, involving different employees, supervisors, time periods, and arrays of facts that inevitably differ even among seemingly similar situations. *See Kendrick*, 220 F.3d at 1233 (noting the federal role is not to become a super-personnel department that second-guesses the employer's business judgment). Instead, Title VII forbids intentional discrimination based on an employee's membership in a protected class. *Id.* at 1232.

Dorris identifies no evidence to suggest that she was treated differently as compared to her similarly situated, nonprotected colleagues.[3] Her strongest examples involve A.S. and M.M., both white employees who also reported to Wahl, Siscoe, and Thomas (according to Dorris). Doc. 65 at 81. But the evidence Dorris cites undermines her claim. Wahl coached M.M. after a failure to notify GTM that he would be late, Doc. 68-1 at ¶ 189, and then Siscoe issued him a Written Warning after he arrived 13 minutes late a few months later, *id.* at ¶ 190. Dewitt issued A.S. a Written Warning for failing to call in more than four hours before her scheduled shift, Doc. 65-40, and Wahl and Siscoe issued her a Final Warning for failing to notify GTM altogether before arriving one minute late to work, Doc. 65-41. Doc. 68-1 at

---

[3] Much of Dorris's briefing focuses on whether certain acts and omissions were properly categorized under the internal policy. *See, e.g.*, Doc. 65 at 81-82. At the hearing, counsel for Dorris confirmed that she is not asserting a claim based on the failure to apply GTM's Progressive Discipline Policy or Attendance Policy in a certain way and disclaimed seeking a ruling on whether an identified employment act or omission was properly characterized under GTM's policies. Rather, counsel indicated that the differential application of the policies to Dorris, A.S., and M.M.—which she contends shows white employees received more chances than she did—confirms that she was treated differently because of her race. Doc. 65 at 79–83. As noted, there is no evidence suggesting that race may have been a motivating factor in that perceived differential treatment.

13

¶¶ 182, 185; Doc. 65-18. Dorris argues that Wahl, Siscoe, and Dewitt's decisions to define the conduct in less severe categories (e.g., Tardiness rather than Failure to Follow Procedures) protected her white co-workers from the subsequent Progressive Discipline Policy steps. Doc. 65 at 82; *see supra* n.5. But the fact is that those write-ups were Written Warnings—the second step in the Progressive Discipline Policy. Doc. 68-1 at ¶ 58. Moreover, Dorris did benefit from at least two instances of going undisciplined despite failing to notify before a late arrival on November 1, 2018, Doc. 68-1 at ¶ 217, and January 31, 2019, Doc. 65 at 16, ¶ 47.

Dorris, justifiably, makes much of the conduct she attributes to Wahl, Siscoe, and Dewitt. Specifically, she points to text messages where they engaged in exchanges that are unprofessional and mean-spirited. Doc. 65-38; Doc. 65 at 67–69, ¶¶ 162–179. That sentiment, coupled with what Dorris perceived to be Wahl and Siscoe's encouragement that she talk in a "higher, chipper, extremely chipper voice," Doc. 65 at 29, ¶ 83, amply supports Dorris's belief that they did not like her and that one possible explanation for that dislike might have been Dorris's race. But, even crediting that view, Glodowski made the decision to terminate Dorris after an independent review of her conduct (which Dorris does not dispute), and Dorris provides no evidence that Glodowski harbored (or was even aware of) any animus towards her.

### 2.

Dorris also fails to demonstrate pretext with regard to her argument that she was fired in retaliation for engaging in protected opposition to racial discrimination. Doc. 60 at 5–6; Doc. 65 at 98–103. Title VII forbids firing an employee because she opposed a discriminatory practice or because she "participated . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

Dorris contends that she engaged in protected conduct during a February 1, 2019, meeting with Wahl and Siscoe. In that meeting, they discussed the customer call that was the basis for her Final Warning. At that meeting, Dorris told Wahl and Siscoe that she believed she was being criticized for the way that she talks. Specifically, Dorris believed that Wahl and Siscoe wanted her to talk more like they did. Doc. 65 at 29, ¶ 83.

Dorris intended for her comments to convey the belief that Wahl and Siscoe were discriminating against her because she did not talk like a "chipper" white woman and was being disciplined differently because she is black and "has a different tone and tenor of voice than Wahl and Siscoe . . . ." Doc. 65 at 29, ¶ 83. Wahl and Siscoe perceived this was what Dorris intended, as they subsequently met with Thomas from HR to determine if Dorris meant those statements to be a race-based complaint. *Id.* at 61, ¶ 126. These facts give rise to Count II, in which Dorris alleges that GTM terminated her employment in retaliation for her complaints during that meeting, a Title VII-protected activity. Doc. 62 at 37–41.

Again, assuming she has made a prima facie case,[4] she has no evidence that GTM's proffered reason for the termination is false or unworthy of belief. As previously discussed, there is no evidence to suggest Glodowski's decision was based on anything but the substandard conduct that Dorris acknowledges occurred.

Dorris raises three arguments to counter this conclusion. In particular, she alleges that (i) Thomas, the HR representative, knew Dorris complained about racial discrimination during the February 1, 2019, meeting but intentionally failed to ask Dorris to confirm or otherwise follow up on her complaints; (ii) Thomas failed to follow GTM's Open Door and Harassment Policies by not meeting with Dorris herself to clarify what Dorris meant at the meeting; and (iii) the timing reflects discriminatory purpose. Doc. 60 at 5–6; Doc. 65 at 98–103.

None of these three arguments, as a matter of law, support a claim of pretext. As noted above, Glodowski made the decision to terminate Dorris based on her independent assessment of Dorris's substandard conduct. Thomas did not make this decision. There is no evidence to suggest that Glodowski was aware of Dorris's protected comments to Wahl and Siscoe, much less motivated by it. That precludes liability. *Kendrick*, 220 F.3d at 1233.

---

[4] It is highly doubtful that Dorris stated a *prima facie* case of retaliation. To make such a claim, a plaintiff must show that she engaged in a Title VII-protected activity, suffered a material adverse action, and establish a causal connection exists between the protected activity and the adverse action. *Thomas*, 803 F.3d at 514. The jury must be able to infer that the animus was a but-for cause of her termination. *Id.* at 516. Dorris does not provide any evidence her complaint played into, much less was a but-for cause of Glodowski's decision.

15

### 3.

Dorris has similarly failed to produce evidence suggesting that she was fired in retaliation for filing a workers' compensation claim, which is prohibited under Kansas state law. *See generally Macon*, 743 F.3d at 713. Assuming once again that the first two steps have been met,[5] the focus is on whether Dorris has identified "evidence that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer." *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002); *see also Macon*, 743 F.3d at 713. But as with the other two claims, there is no evidence to undermine Glodowski's decision or to suggest that she was aware of (much less motivated by) Dorris's decision to file a workers' compensation claim and seek medical attention for her wrist condition. *Contra* Doc. 60 at 7.

It is difficult to discern how, if at all, Dorris's pretext arguments in support of this claim vary from her two Title VII claims. Indeed, her two-page response, which is primarily focused on the issue of causal connection, does not confront GTM's pretext argument. At best, Dorris's brief recounts the interactions with Thomas, GTM's insurance company, and Siscoe to suggest that they questioned whether Dorris was injured. Doc. 65 at 106–07 (suggesting this might convince a jury that GTM had a retaliatory intent). Again, those concerns are unrelated to Glodowski's decision.

### B

Dorris also contends that she was denied an accommodation in violation of the ADA. Specifically, Dorris contends that GTM failed to accommodate her disability, wrist tendonitis and pre-carpal tunnel

---

[5] For her *prima facie* evidence, Dorris has shown that (i) she told Thomas she planned to file a workers' compensation claim for her wrist injury, Doc. 65 at 64, ¶ 141; (ii) GTM terminated her, Doc. 60 at 3, § 2(a)(xxi); and (iii) that the termination occurred only a few days after Dorris notified GTM of her intention to file the workers' compensation claim, Doc. 65 at 105–07. That is sufficient. *See Macon*, 743 F.3d at 713; *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that a six-week period on its own may show causal connection in a retaliation claim); *see also Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1270 (10th Cir. 2008) (noting that under Kansas law, temporal proximity constitutes highly persuasive evidence of retaliation) (citing *Gertsch v. Cent. Electropolishing Co.*, 26 P.3d 87, 90 (Kan. Ct. App. 2001)). Dorris does not dispute the legitimate, nondiscriminatory reason GTM offered for her termination. *See supra* Part II.A.

syndrome, after she requested an appropriately tall chair for her standing work desk. Doc. 60 at 6; Doc. 65 at 104–105.[6]

The ADA prevents covered employers from "discriminat[ing] against a qualified individual on the basis of disability" regarding discharge or "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[N]ot making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability" constitutes actionable discrimination under the ADA. *See* § 12112(b)(5)(A).

Summary judgment in the ADA context calls for a modified *McDonnell Douglas* burden-shifting approach. *Smith v. Midland Brake, Inc., Div. of Echlin, Inc.*, 180 F.3d 1154, 1178 (10th Cir. 1999). To succeed in her claim, Dorris must first make a *prima facie* showing that she is disabled within the meaning of the ADA, she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired, and GTM, with adequate notice of Dorris's request, failed to provide a reasonable accommodation. *Exby-Stolley v. Bd. of Cty. Commissioners*, 979 F.3d 784, 795 (10th Cir. 2020).[7]

If Dorris succeeds, the burden then shifts to GTM to either conclusively rebut one or more elements of Dorris's *prima facie* case or establish an affirmative defense. *See Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017). If GTM does either, Dorris must finally present evidence to establish a genuine dispute regarding GTM's defense or to rehabilitate the challenged element of her *prima facie* case. *Id.* at 1050.

**1.** Dorris fails to establish the *prima facie* elements. To be recognized as a disability under the ADA, the impairment must substantially limit the employee's ability to work. *Sanchez v. Vilsack*, 695 F.3d 1174, 1178 (10th Cir. 2012). It is not clear whether wrist tendonitis/pre-carpal

---

[6] At the hearing, counsel acknowledged the claim is limited to a failure-to-accommodate theory and that the accommodation sought was the chair. After Dorris submitted her medical record from K+Stat and requested an ergonomic keyboard, Doc. 65 at 64, ¶ 144, Thomas in HR ordered the keyboard that day.

[7] A petition for *certiorari* was docketed March 26, 2021, by the U.S. Supreme Court and has not yet been resolved. *See Board of Cty. Comm'rs of Weld County v. Exby-Stolley*, Case No. 20-1357.

tunnel syndrome counts as a disability under the ADA,[8] or whether Dorris's impairment substantially limited her ability to work.[9] But it is not necessary to delve into those legal and factual issues because Dorris has not and cannot establish that GTM failed to accommodate her request.

Because Dorris did not adequately notify GTM of her alleged condition, she did not trigger GTM's duty to either provide a reasonable accommodation or engage in an interactive process with her per the ADA. *C.R. England, Inc.*, 644 F.3d at 1049. While an employee's notice can be informal and still fulfill the ADA requirements, Dorris needed to make it clear that she sought assistance for her disability and the resulting limitations. *See* 29 C.F.R. § 1630.9(a). As she was not diagnosed with pre-carpal tunnel and wrist tendinitis until several months after her alleged notification (asking for a taller chair), Doc. 65 at 64, ¶ 144; 104; *see* Doc. 65-33, there is no way she could have done so.

---

[8] GTM briefly argues that carpal tunnel syndrome does not constitute a recognized disability but provides no Tenth Circuit authority to support that contention. Doc. 61 at 42–44. Some courts have assumed carpal tunnel can be an ADA-recognized disability. *See, e.g., Smith v. Millennium Rail, Inc.*, 241 F. Supp. 3d 1183, 1197 (D. Kan. 2017) (holding carpal tunnel fulfilled the ADA failure-to-accommodate claim requirements because plaintiff alleged it was disabling and his employer knew about it). Earlier courts seemed to dispose of claims without deciding whether carpal tunnel counted. *See Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1160 (10th Cir. 2002) (hinging the analysis on whether the injury was substantially limiting rather than just categorizing carpal tunnel as an ADA-recognized disability); *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000) (plaintiff failed to make a reasonable request for accommodation regardless of the disability alleged); *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1183 (10th Cir. 2016) (did not rule on whether plaintiff's severe carpal tunnel constituted an actual disability because ADA-retaliation claims do not require that determination). Dorris was diagnosed with pre-carpal tunnel, making the conclusion even less clear.

[9] That she had to miss work due to wrist pain, Doc. 65 at 75, ¶ 216, and quit her subsequent job because her wrist was "hurting her and keeping her from working," Doc. 65 at 39, ¶ 115, is probably not enough to meet the required standard. Dorris has not provided any evidence showing an inability to perform her job at the office. *See E.E.O.C. v. BNSF Ry. Co.*, 124 F. Supp. 3d 1136, 1142–43 (D. Kan. 2015), *aff'd sub nom. Equal Emp. Opportunity Comm'n v. BNSF Ry. Co.*, 853 F.3d 1150 (10th Cir. 2017) (finding no substantial limitation where plaintiff could still perform manual tasks with his injured hand, such as yard work, vacuuming, driving, showering, bathing); *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir. 1994) ("[The] inability to return to h[er] particular job without some accommodation does not demonstrate a substantial limitation in the major life activity of working.").

Dorris alleges that when she started at GTM in September 2018, she selected a standing desk (rather than a seated one) and that her wrist pain started shortly thereafter and "continued through March 2020." Doc. 65 at 74, ¶¶ 208–09; 104. The crux of her argument is that after Dorris asked her supervisor (Wahl at the time) for a taller chair, Wahl told her "We don't have that." *Id.* at 75 ¶ 212. So Dorris went without an appropriately sized chair for her standing desk for ten days, until she purchased one herself. *Id.* at 8, ¶ 22.

While GTM acknowledges Dorris sought a high chair "to go with [her] high desk," Doc. 68 at 16, it argues that Dorris never suggested that her desire was for a medical reason or because she thought she had a disability the high chair would resolve. Doc. 62 at 45; *see also* Doc. 65 at 38, ¶ 108 (admitting she told the doctor that her wrist pain did not start until late December 2018). Dorris's testimony confirms GTM's position: she admitted that "[she] didn't say [she wanted the chair] because of a medical reason." Doc. 61-4 at 213:16–22; Doc. 62 at 45. And again, she would not have been able to at that point because she was first diagnosed in February 2019. Doc. 62 at 43 (citing SOF ¶¶ 108–112); *see also* Doc. 65 at 38, ¶¶ 108–13 (admitting these facts). Without a request for an accommodation, Dorris's ADA claim fails. *Exby-Stolley*, 979 F.3d at 795; *see also* 42 U.S.C. § 12112(b)(5)(A) (prohibiting the failure to make reasonable accommodations for *known* physical limitations of a disabled individual).

Dorris's contrary argument is insufficient. Neither telling Wahl and Dewitt her wrists were "completely bent down like this at work (indicating)," Doc. 65 at 39, ¶ 114, nor "sp[eaking] many times with Wahl and Dewitt about her wrist injury" seemingly caused by working at a standing desk with a low chair, *id.* at 74, ¶ 209, constitutes an effective request for accommodation under the ADA. A valid request must be "direct and specific" so that the employer knows the employee's request is for "special accommodation," *i.e.* for a disability. *Mountain Coal Co., LLC*, 830 F.3d at 1188 (internal citations omitted); *see also C.R. England, Inc.*, 644 F.3d at 1050 (finding that a request for time off for "family time" did not adequately notify the employer the employee needed time of due to his illness, even though the employer knew of his HIV-positive status). Dorris's failure-to-accommodate claim cannot proceed because her evidence fails to identify a direct and specific request.

### III

For the foregoing reasons, GTM's Motion for Summary Judgment is GRANTED.

It is so ordered.

Date: June 14, 2021            s/ Toby Crouse
                                                   Toby Crouse
                                                   United States District Judge